# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL CASE NO. 1:20-cv-00016-MR

| | |
|---|---|
| **MATTHEW HODGE,** ) <br> ) <br>     **Plaintiff,** ) <br> ) <br> vs. ) <br> ) <br> **NORTH CAROLINA DEPARTMENT** ) <br> **OF PUBLIC SAFETY and DIVISION** ) <br> **OF ADULT CORRECTION AND** ) <br> **JUVENILE JUSTICE** ) <br> ) <br>     **Defendants,** ) <br> _____ ) | **MEMORANDUM OF** <br> **DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment. [Doc. 25].

## I.   PROCEDURAL BACKGROUND

On January 16, 2020, Matthew Hodge (the "Plaintiff") filed this action against the North Carolina Department of Public Safety ("DPS") and the Division of Adult Correction and Juvenile Justice ("DAC" and collectively, the "Defendants"), presenting a single claim for retaliatory discharge under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (the "FLSA").  [Doc. 1].

On March 13, 2020, the Defendants filed an Answer to the Complaint. [Doc. 13].

On January 27, 2021, the Defendants filed the present Motion for Summary Judgment. [Doc. 25]. On February 24, 2021, the Plaintiff responded. [Doc. 37]. On March 8, 2021, the Defendants replied. [Doc. 45].

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). The Court

does not make credibility determinations or weigh the evidence when ruling a motion for summary judgment. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

## III. FACTUAL BACKGROUND[1]

The Plaintiff worked as a Corrections Officer at the Rutherford Correctional Center ("RCC") from 2016 to 2019. [Doc. 37-10 at 5]. The RCC is operated by the DPS under the DAC. [Doc. 27 at ¶ 4]. During the time relevant to this case, Harold Reep was the superintendent of the RCC and

---

[1] This factual recitation is presented for the purposes of the Defendants' Motion for Summary Judgment. Accordingly, the facts are presented in the light most favorable to the Plaintiff. Adams. v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

3

Larry Godwin was the assistant superintendent of the RCC. [Doc. 27 at ¶ 3; Doc. 41-5 at 3].

At some point, the Plaintiff began to believe that the RCC was not compensating the corrections officers for all hours worked. The Plaintiff claims that he complained to Shayne Dotson, an RCC Administrative Specialist, about working unpaid hours at least ten times. [Doc. 37-10 at 24-25; Doc. 39 at ¶ 12]. One of the Plaintiff's co-workers, Sergeant David Holbrook, also claims that he complained to Dotson about concerns with his pay in 2016. [Doc. 38 at ¶ 6].[2] Dotson denies ever hearing any complaints from the Plaintiff or Holbrook and states that no one ever told her about any such complaints. [Doc. 29 at ¶ 10-11].

During their depositions, the Plaintiff and Holbrook both claimed to have spoken only to each other about the potential lawsuit. [Doc. 30-1 at 17-18; Doc. 30-2 at 6-7]. The Plaintiff, however, submits a declaration stating that he "spoke with a few of the other [corrections officers] at RCC about whether they would join a lawsuit if I brought one." [Doc. 39 at ¶ 10]. The Plaintiff specifically remembers talking about the lawsuit with "Officer Anderson." [Id.]. The Plaintiff claims that "word of the potential lawsuit

---

[2] The Plaintiff claims that Holbrook sent an email to Dotson regarding the pay dispute. [Doc. 37-10 at 27].

spread" and "[b]y June 2019, it was common knowledge at [RCC] that I was trying to bring a class action lawsuit over our wages." [Id. at ¶ 12]. Holbrook also submits an affidavit stating that he "spoke with a few of the other [corrections officers]" at RCC about whether they would join a lawsuit and agrees that "everyone at [RCC] knew about the potential lawsuit." [Doc. 38 at ¶ 11].

On June 4, 2019, the Plaintiff and Holbrook met with an attorney about a potential lawsuit for unpaid wages. [Id. at ¶ 8]. During that meeting, the Plaintiff and Holbrook decided to file a lawsuit against the Defendants and signed a representation agreement with the attorney. [Doc. 30-1 at 7-8].

On June 20, 2019, the Plaintiff completed his shift at the RCC and went to the nearby Carolina Café to eat breakfast while still wearing his uniform. The Plaintiff and other corrections officers at the RCC often went to the Carolina Café before, during, and after shifts. [Doc. 37-10 at 53; Doc. 31-17 at 4, 37]. The Carolina Café offered different discounts to various public employees: law enforcement officers received free drinks and $2 breakfasts, while other public employees, such as corrections officers, received free drinks. [Doc. 30-3 at 4]. On multiple other occasions, including June 10, 2019, the Plaintiff had received the law enforcement discount, which reduced the cost of his breakfast to $2. [Doc. 39 at ¶ 15; Doc. 39-1 at 5].

On June 20, the Plaintiff finished his meal and asked Kara Elmore, the Carolina Café employee working the register, to give him the law enforcement discount. [Doc. 30-3 at 3]. The Plaintiff showed his badge and gestured to his uniform. [Doc. 37-4 at 9-12; Doc. 37-17 at 11]. Sandra Taylor, another Carolina Café employee, overheard the request and responded that the law enforcement discount was available only for police officers, not corrections officers. [Doc. 30-4 at 3-4]. According to Taylor, the Plaintiff told her that he worked for the Forest City Police Department on the weekends. [Doc. 30-4 at 15]. After a short disagreement, the Plaintiff paid for his meal and left the Carolina Café. [Doc. 39 at ¶ 19].[3]

Later that day, the Plaintiff posted an online review of the Carolina Café under the name "Tyler Hodge." [Doc. 39 at ¶ 22; Doc. 37-10 at 56]. That review stated: "I'm not sure why this place has high reviews. Food is overpriced and they have zero respect for people in uniform. Would not recommend this place." [Doc. 39 at ¶ 22; Doc. 28-1 at 5]. Four other negative reviews of the Carolina Café were posted on June 20. [Doc. 28-1

---

[3] While it is undisputed that the Plaintiff received a free drink, it is unclear if the Plaintiff paid full price for his meal. The Plaintiff testified that he paid the full amount for his meal and provides a bank statement showing a payment of $7.25. [Doc. 39 at ¶ 19; see also Doc. 39-1 at 8]. Taylor also claims that the Plaintiff paid full price for his meal. [Doc. 30-4 at 6]. On the other hand, Elmore states that the Plaintiff paid the law enforcement discount price of $2 for his meal and claims that she paid the difference out of her own pocket. [Doc. 30-3 at 7-11].

at 2-5]. One of the reviews, posted under the name "Matthew Hodge," stated "One hour to get my food. Go to McDonald's. Food was very dry and rude staff." [Doc. 28-1 at 4]. Another review posted by "Reyou Hodge" stated "YOUR BUSINESS IS BRINGING CRACKHEADS NEAR MY BUSINESS. DON'T EAT HERE MANY DRUGGIES." [Id. at 4]. A review from a user identified as "Hailey Melton" stated "Do. Not. Go. To. This. Place Very rude and food was not cooked." [Id.]. Another reviewer identified as "Destiny Shy" stated: "Waitress there have bad attitude I've went there few times to see if I could Be treated differently and I feel there very racist due to me being a african American." [Id. (errors in original)].

Although the Plaintiff admits that he posted the review under the name "Tyler Hodge," he denies posting any of the other reviews. [Doc. 37-10 at 56-60]. The Plaintiff claims that he does not recall posting the review from "Matthew Hodge," [Id. at 58], even though his name is Matthew Hodge. The Plaintiff also denies posting the review from "Reyou Hodge," even though he uses reyoulol@gmail.com as his personal email address. [Id. at 60-61]. The Plaintiff concedes, however, that at least some of the reviews were posted by his family members. [Id. at 54-55].

Later that day, Taylor saw the reviews and searched the names of the reviewers on Facebook. [Doc. 30-4 at 16]. She found the Plaintiff's

7

Facebook account and identified him as the individual who had been at the Carolina Café that morning. [Id.].

That afternoon, an RCC corrections officer picked up lunch at the Carolina Café. [Id. at 13-15]. Taylor told the officer about what happened with the Plaintiff that morning and explained that she had identified the Plaintiff as the individual who had posted the reviews. [Id. at 14]. That officer returned to the RCC and told Reep about the events. [Doc. 27 at ¶ 7].

Reep and Godwin went to the Carolina Café to investigate the incident. [Id.]. Carolina Café employees told Reep and Godwin that the Plaintiff demanded a "steep discount" and that the Plaintiff "represented to the Carolina Café employees that he worked as a police officer for the Forest City Police Department." [Id. at ¶¶ 8-9]. The employees told Reep and Godwin that the Plaintiff had made "a scene" about not receiving the law enforcement discount on a prior occasion. [Id. at ¶ 9]. The employees also showed Reep and Godwin the negative reviews that had been posted and explained that such postings were unusual. [Id. at ¶ 10]. Reep recognized that some of the reviews were posted under the last name "Hodge," and claims that the reviews by "Hailey Melton" and "Destiny Shy" were "posted under obvious false names" and "obvious pseudonyms." [Id. at ¶¶ 10, 13].

8

Reep and Godwin went back to the RCC and asked RCC Sergeant James Pursley to come to the Carolina Café to record the surveillance camera footage of the Plaintiff. [Id. at ¶ 11]. Reep, Godwin, and Pursley all returned to the Carolina Café, where Pursley obtained copy of the video recording and Reep and Godwin obtained written statements from Elmore, Taylor, and the Carolina Café's owner, Ruby Fortner. [Id.; Doc. 31-1 at 2-4].

After leaving the Carolina Café for the second time, Reep, Godwin, and Pursley travelled to the Forest City Police Department. [Doc. 27 at ¶ 12]. The Forest City Police Department confirmed that the Plaintiff never worked there. [Id.]. The entire investigation was conducted on the same date as the incident and took roughly two hours. [Doc. 41-8 at 16-17].

Reep concluded that the Plaintiff "had engaged in unprofessional conduct that reflected negatively on [RCC] by attempting to obtain favorable treatment from the restaurant and by subsequently attempting to harm the restaurant by posting negative and false reviews." [Doc. 27 at ¶ 13]. Reep had Godwin summon the Plaintiff before his shift that evening. [Id.].

The Plaintiff met with Reep, Godwin, and Dotson that afternoon. [Id. at ¶ 14]. During the meeting, Reep confronted the Plaintiff about the events at the Carolina Café and showed him the employees' statements, the internet reviews, and the surveillance footage. [Id.]. Reep informed the Plaintiff that

9

he would have to report the incident to the DPS Office of Special Investigations. [Id. at ¶ 14]. While Reep claims that he told the Plaintiff that he had to decide whether to resign, and that an investigation would be opened even if the Plaintiff resigned, [Doc. 27 at ¶ 15], the Plaintiff claims that Reep told him that he "should resign, or an investigation would be opened and [he] wouldn't make it through the investigation." [Doc. 39 at ¶ 26]. Although Reep, Godwin, and Dotson state that the Plaintiff was never threatened or advised to resign, [Doc. 27 at ¶ 15; Doc. 28 at ¶ 15; Doc. 29 at ¶ 7], the Plaintiff claims that Reep shouted that he had never "seen anyone make it back from this kind of thing." [Doc. 37-10 at 51-52].

It is undisputed that the Plaintiff signed a letter of resignation during the meeting, listing as his reasons: "trying new things, would like to come Back and personal Reasons." [Doc. 31-3 at 2 (errors in original)]. The Plaintiff claims that he resigned because he wanted to stay in the Rutherford community and continue his career with the DPS. [Doc. 39 at ¶ 28]. Reep, Godwin, and Dotson state that they had no knowledge that the Plaintiff had engaged in any protected activity at the time. [Doc. 27 at ¶ 22; Doc. 28 at ¶ 23; Doc. 29 at ¶¶ 10-11].

After the Plaintiff resigned, Reep reported the incident to the DPS Office of Special Investigations, which ordered the RCC to conduct an

internal investigation. [Doc. 27 at ¶ 17]. Godwin conducted the investigation. [Id.]. Godwin's report states that the Plaintiff's actions constituted "[m]isconduct and a violation of the State Gift Ban." [Doc. 31-2 at 7].

The Plaintiff has since reapplied for employment with the DPS. [Doc. 39 at ¶ 30]. When notified that the Plaintiff reapplied, Reep alerted the administrative section of the DPS that he did not believe the Plaintiff should be rehired. [Doc. 41-8 at 29]. The RCC's employee relations system states that the Plaintiff would have been recommended for dismissal and that the RCC does not recommend rehiring him. [Doc. 41-7 at 2-4]. The Plaintiff has not received an interview with the DPS. [Doc. 39 at ¶ 30].

On October 28, 2019, the Plaintiff filed a putative class action complaint against the Defendants for unpaid wages under the FLSA, which is currently pending in the United States District Court for the Eastern District of North Carolina and is separate and apart from this action. Hodge v. North Carolina Dep't of Pub. Safety, No. 5:19-cv-00478 (E.D.N.C.).

## VI. DISCUSSION

Section 215(a)(3) of the FLSA makes it unlawful for a covered employer to "discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter[.]" To assert a

11

prima facie claim of retaliation under the FLSA, the plaintiff must show "that (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008).[4]

## 1. Adverse Employment Action

The Plaintiff brings a single claim against the Defendants asserting that they took adverse employment action against him by constructively discharging him during the June 20 meeting. [Doc. 1 at ¶ 39].[5]

---

[4] The Defendants claim that the Plaintiff never engaged in protected activity under the FLSA because he did not file this lawsuit until after he had been terminated. [Doc. 45 at 4]. The Plaintiff, however, contends that his complaints to Dotson constituted protected activity under the FLSA. [Doc. 37 at 2-3]. For the purposes of the Defendants' Motion for Summary Judgment, the Court assumes without deciding that the Plaintiff's complaints to Dotson constitute protected activity under the FLSA.

[5] The Plaintiff's Complaint asserts a single claim of retaliatory discharge under the FLSA. [Doc. 1 at ¶¶ 40-48]. The Plaintiff's opposition to the Defendants' Motion for Summary Judgment, however, raises a new additional theory that the Defendants retaliated against the Plaintiff by refusing to rehire him. [Doc. 37 at 17, 23-24]. A defendant is not required to "infer all possible claims that could arise out of the facts set forth in the complaint." Gilmour v. Gates, McDonald, & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Thus, a plaintiff "is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories . . . ." Priddy v. Edelman, 883 F.2d 438, 446 (6th Cir. 1989). Accordingly, the Fourth Circuit and several other circuits have held "that a plaintiff may not raise new claims after discovery has begun without amending his complaint." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) (collecting cases). Because the Plaintiff fails to assert in his Complaint that the Defendants' retaliated against him by failing to rehire him, the Plaintiff cannot rely on that argument in opposition to Defendants' Motion for Summary Judgment.

To establish constructive discharge, the Plaintiff must show that his employer discriminated against him "to the point where his 'working conditions bec[a]me so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, ____ U.S. ____, 136 S. Ct. 1769, 1776, 195 L. Ed. 2d 44 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)). "Intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign, . . . that is, whether he would have had *no choice* but to resign." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019) (emphasis in original).

The Plaintiff contends that his working conditions became intolerable during the June 20 meeting when Reep explained that he was going to open an investigation into the incident at the Carolina Café and shouted that he had never seen anyone "make it back" from such an investigation. [Doc. 37 at 16].

A "working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" Chapin v. Fort-Rohr Motors, Inc., 621 F.3d 673, 679 (7th Cir. 2010) (quoting Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331, 333 (7th Cir. 2004)). Consequently, an employee is not constructively discharged by being

notified of his "employer's intent to commence a process that could lead to [his] discharge" provided that "'the employer [does] not undermine the employee's position, perquisites, or dignity in the interim.'" Wright v. Illinois Dep't of Child. & Fam. Servs., 798 F.3d 513, 529 (7th Cir. 2015) (quoting Cigan, 388 F.3d at 333); Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002) (explaining that an employee was not constructively discharged by being placed on a performance plan because any termination "was contingent on future developments, rather than being a present plan or decision"). Accordingly, merely notifying an employee of an investigation that may lead to his termination does not constitute a constructive discharge, unless the employer otherwise imposed conditions that made the employee's working conditions intolerable. Williams v. Giant Food, Inc., 370 F.3d 423, 434 (4th Cir. 2004)

Even though Reep predicted that the investigation would likely lead to the Plaintiff's termination, Reep explained that the Plaintiff could choose whether to resign, but that an investigation would occur even if he resigned. [Doc. 27 at ¶ 15].[6] Thus, the Plaintiff had a choice. He could either resign or attempt to survive the investigation. Evans, 936 F.3d at 193 (explaining

---

[6] While the Plaintiff testified that Reep told him to resign or "an investigation would be opened[,]" [Doc. 39 at ¶ 26], the Defendants opened an investigation even after the Plaintiff resigned. [Doc. 27 at ¶ 17].

14

that a constructive discharge occurs when an employee has "*no choice* but to resign."). As such, this case is clearly distinguishable from those cases where employees were constructively discharged by being asked or directed to resign. Welch v. Univ. of Texas & Its Marine Sci. Inst., 659 F.2d 531, 534 (5th Cir. 1981) (finding a constructive discharge when a doctor told a woman that she would be unable to work for him because he did not want a woman doctor in his employ and "[a] reasonable person would certainly resign employment after being ordered to leave."); Acrey v. Am. Sheep Indus. Ass'n, 981 F.2d 1569, 1574 (10th Cir. 1992) (finding a constructive discharge when an employer asked an employee to quit and then told her that she would be fired if she did not resign). Accordingly, no reasonable jury could find that the Defendants constructively discharged the Plaintiff by opening an investigation into his conduct. Thompson v. Kanabec Cty., 958 F.3d 698, 708 (8th Cir. 2020) (explaining that no adverse employment action occurred when a County Board member suggested that an employee could circumvent her likely termination by resigning).

The Plaintiff has presented no forecast of evidence from which a jury could conclude that the Defendants imposed any other conditions that made the Plaintiff's working conditions intolerable. Williams, 370 F.3d at 434. It is undisputed that the Plaintiff resigned at the same meeting where Reep,

15

Godwin, and Dotson first confronted him about the dispute at the Carolina Café and the subsequent online posts. The Plaintiff does not argue that the Defendants took any actions before that meeting that made his work conditions intolerable. In fact, the Plaintiff testified that he "loved [his] job" and that his "goal was to go back to the prison system" in the future. [Doc. 37-10 at 50-51].

Likewise, there is no forecast of evidence to demonstrate that the Defendants threatened to take any action against the Plaintiff beyond opening an investigation into his conduct, which Reep explained would happen regardless of whether the Plaintiff resigned or not. [Doc. 27 at ¶ 15]. The Plaintiff has presented no forecast of evidence to show that the Defendants ever threatened to demote him, reduce his pay, alter his duties, suspend him, or do anything else that would have materially changed his working conditions. While the Plaintiff claims that Reep allegedly shouted at him during the meeting, [Doc. 37-10 at 51-52], the Fourth Circuit has concluded that being shouted at by a supervisor "is not so intolerable as to compel a reasonable person to resign." Perkins v. Int'l Paper Co., 936 F.3d 196, 212 (4th Cir. 2019) (citing Williams, 370 F.3d at 434). Accordingly, the Plaintiff has presented no forecast of evidence from which a reasonable just

could conclude that the Defendants made the Plaintiff's work environment intolerable prior to June 20, 2019.

The Plaintiff also claims that the Defendants retaliated against him for his protected FLSA activities by simply threatening to open an investigation. [Doc. 37 at 16]. It is, however, undisputed that the Defendants received a credible allegation that the Plaintiff had solicited a benefit that could violate the State Gift Ban, that the Plaintiff engaged in a verbal altercation with a local business while in uniform, and that the Plaintiff retaliated against the Carolina Café when the gift was not provided. In light of the seriousness of this allegation, and the additional allegation that the Plaintiff had padded his request for the discount with an overt misrepresentation of a connection with the Forest City Police Department, no reasonable jury could conclude that the initiation of an investigation was retaliatory. Governmental entities have an obligation to investigate such allegations.

Because the Plaintiff has failed to provide a forecast of evidence from which a reasonable jury could conclude that the Defendants made the Plaintiff's work conditions intolerable, the Plaintiff has failed to demonstrate that he was constructively discharged. Accordingly, no reasonable jury could find that the Defendants subjected the Plaintiff to an adverse employment action.

## V. CONCLUSION

Because no reasonable jury could conclude that the Plaintiff suffered an adverse employment action, the Plaintiff has failed to establish a prima facie case of retaliatory discharge. Accordingly, the Defendants' Motion for Summary Judgment will be granted.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 25] is **GRANTED** and the Plaintiff's claim for retaliatory discharge under the FLSA is **DISMISSED WITH PREJUDICE**.

The Clerk is respectfully directed to close this civil action.

**IT IS SO ORDERED**.

Signed: June 28, 2021

Martin Reidinger
Chief United States District Judge